<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

PAUL EDWARD COOMER,           :
                              :   Civil Action No. 09-3304 (JAP)
              Plaintiff,      :
                              :
         v.                   :   **OPINION**
                              :
DR. FLORA DeFILIPPO, et al.,  :
                              :
              Defendants.     :

**APPEARANCES:**

Plaintiff <u>pro</u> <u>se</u>              Counsel for Defendants
Paul Edward Coomer                Flora DeFilippo, Abu Ahsan,
New Jersey State Prison           and Johnny Wu
Trenton, NJ  08625            Christine H. Kim
                              Deputy Attorney General
                              R.J. Hughes Justice Complex
                              Trenton, NJ  08625

**PISANO**, District Judge

     This matter was opened to the Court by Plaintiff Paul Edward

Coomer filing a Complaint, dated July 2, 2009, alleging

violations of various constitutional rights.  By Opinion and

Order (Docket Entries No. 2, 3) entered December 1, 2009, this

Court dismissed all claims except Plaintiff's Eighth Amendment

medical care claim against Defendants Flora DeFilippo, Abu Ahsan,

and Johnny Wu.[1]

_____

     [1] Dr. Abu Ahhan and Dr. Johnny Wu are general practitioners
who provide medical treatment to inmates at New Jersey State
Prison.  Dr. Flora DeFilippo is a psychiatrist who provides
mental health care to inmates at NJSP.

Now pending before this Court is the Motion (Docket Entry No. 48) on behalf of these remaining defendants for judgment on the pleadings and/or for summary judgment.  Briefing is completed[2] and this matter is now ready for decision.

I.  BACKGROUND

Plaintiff alleges that he is neurologically, physically, and visually handicapped.  More specifically, he alleges that he suffers from: impaired vision in one eye and total blindness in the other, neurological damage from an old injury, intense subdural pain, memory loss, cognitive impairments, Chronic Obstructive Pulmonary Disease, asthma, rheumatoid arthritis, nerve damage in his extremities, and limited mobility through the use of prosthetic devices.

---

[2] Plaintiff requested two extensions of time to respond to the motion or to file his own motion, which were granted.  In his second request for extension of time, Plaintiff stated the he would require no further extensions of time.  (Docket Entry No. 54-5.)  Nevertheless, Plaintiff failed to file a response or separate motion, and he instead requested a third extension of time and further discovery, (Docket Entry No. 59), that Magistrate Judge Douglas E. Arpert denied (Docket Entry No. 60), finding that Plaintiff had failed to demonstrate good cause either to re-open discovery or for a further extension of time.

Plaintiff filed an Appeal, (Docket Entry No. 62), of the Magistrate Judge's Order.  To prevail in such an appeal, Plaintiff must establish that the decision of the Magistrate Judge is clearly erroneous or contrary to law.  Fed.R.Civ.P. 72(a), (b)(3).  Plaintiff has failed to demonstrate any error in the decision of the Magistrate Judge and, therefore, this Court will accept and affirm the decision of the Magistrate Judge.

Plaintiff alleges that, since June 2008, Defendant Dr. Abu Ahsan has refused to treat his neurological and sleep disorder, and his respiratory condition, except with a medication that Plaintiff's medical records reflect he cannot take because of an adverse reaction.  Plaintiff alleges that in March 2009 Dr. Ashan examined Plaintiff, through his cell bars, for the purposes of diagnosing and treating Plaintiff's respiratory illness. However, the only action Dr. Ahsan allegedly took was to prescribe a medication noted in Plaintiff's medical file that he cannot take.  Plaintiff alleges that Dr. Ahsan has refused to re-issue leg braces previously prescribed for Plaintiff's mobility problem.

Plaintiff alleges that beginning in December 2008 Defendant Dr. DeFilippo has refused to treat Plaintiff's neurological disorders.

Plaintiff alleges that beginning on October 1, 2008, Defendant Dr. Johnny Wu has refused to treat his neurological conditions and sleep disorder and discontinued his receipt of the nutritional supplement "Ensure."  Plaintiff also alleges that Dr. Wu conducted a "blood fat" test on him, which Dr. Wu knew would provide inaccurate results and despite Plaintiff's diagnosed belonephobia.  Plaintiff alleges that in January 2009 Defendant Dr. Wu prescribed the pain medication Ultram/Tramadol for Plaintiff's pain, disregarding the information in Plaintiff's

3

medical history that he suffered adverse reactions to this medication, in that it increased Plaintiff's subdural pain.

Plaintiff alleges that in May 2009 he fell and broken two bones in his hand because he was not receiving proper medical treatment for his multiple problems, including proper leg braces and medication.

The Defendants Drs. DeFilippo, Ahsan, and Wu have moved to dismiss this action or for summary judgment.  Defendants assert that they are entitled to a dismissal because Plaintiff has refused to comply with discovery.  The also assert that they are entitled to summary judgment because Plaintiff failed to exhaust his administrative remedies with respect to the Eighth Amendment medical-care claims, because the evidence establishes that they were not deliberately indifferent to his need for medical care, and because they are entitled to qualified immunity.

## II.   SUMMARY JUDGMENT

### A.   Federal Rule of Civil Procedure 56

A district court shall grant summary judgment as to any claim or defense "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party asserting that a fact is genuinely disputed must support the assertion by citing to particular parts of materials in the record, or by showing that the materials cited do not establish

the absence or presence of a genuine dispute, or by showing that an adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1).  Nevertheless, the court may consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).

No genuinely triable issue of material fact exists when the moving party demonstrates that no rational jury could find in the non-movant's favor.  Ambruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir. 1994).  Thus, the threshold enquiry is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  In deciding whether triable issues of material fact exist, a court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995); Hancock Indus. v. Schaeffer, 811 F.2d 225, 231 (3d Cir. 1987).

The rule does not increase or decrease a party's ultimate burden of proof on a claim.  Rather, the moving party bears the burden of showing no genuine issue of material fact, and the non-movant opposes the motion by presenting affirmative evidence to the contrary.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

256-57 (1986).  Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted).  See also Anderson, 477 U.S. at 247-48.  The non-moving party must point to specific facts in the record showing a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); see also Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990) ("The object of [former Rule 56(e), new Rule 56(c)] is not to replace conclusory allegations of the complaint . . . with conclusory allegations of an affidavit."); Anderson, 477 U.S. at 249; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), 507 U.S. 912 (1993) ("To raise a genuine issue of material fact, . . . the opponent need not match, item for item, each piece of evidence proffered by the movant," but must "exceed[] the ' mere scintilla' threshold and . . . offer[] a genuine issue of material fact.").

A movant need not affirmatively disprove the other party's case; he may move on the ground that the non-movant lacks evidence "sufficient to establish the existence of an element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Nevertheless, "[i]t is the defendant's

task to negate, if he can, the claimed basis for the suit."
Celotex, 477 U.S. at 328 (Justice White, concurring).

B.    New Jersey Local Civil Rule 56.1

    New Jersey Local Civil Rule 56.1(a) requires that on summary
judgment motions, both the moving and non-moving parties furnish
a statement identifying what each side deems to be the material
facts, so that the Court can determine if a genuine dispute
exists.  The commentary to the Rule notes that "the requirement
of a separate document represents a change from the practice
under the former version of the rule," and that "[t]he Rule 56.1
statement is viewed by the Court as a vital procedural step,
since it constitutes and is relied upon as a critical admission
of the parties."  The commentary specifies the content and format
of the statement.

    Consequences of a movant's noncompliance with the Rule can
be severe—"[a] motion for summary judgment unaccompanied by a
statement of material facts not in dispute shall be dismissed."
L.Civ.R. 56.1(a).  See also Kee v. Camden County, 2007 U.S. Dist.
LEXIS 23637, at *14 (D.N.J. 2007) (Simandle, Jr.); Langan Eng'g &
Envtl. Servs. v. Greenwich Ins. Co., 2008 U.S. Dist. LEXIS 99341
(D.N.J. 2008) (Greenaway, J.).  Where an opposition brief is not
accompanied by a Rule 56.1 statement, the movant is not
automatically entitled to summary judgment.  Instead, the judge
"may enter summary judgment in favor of the moving party only if

7

the moving party has established that summary judgment is appropriate." Cornelio v. Coupon Serv. Corp., 2007 U.S. Dist. LEXIS 213, 15 *5 (D.N.J. 2007) (Pisano, J.). Such a scenario is predicated on the movant having filed a Rule 56.1 statement.

### III.   DISCUSSION

As a preliminary matter, Defendants move for summary judgment on the ground that Plaintiff has failed to exhaust his administrative remedies. See 42 U.S.C. § 1997e.

No action may be brought by a prisoner with respect to prison conditions unless the prisoner has exhausted available administrative remedies. 42 U.S.C. § 1997e(a). Exhaustion is mandatory. A prisoner must exhaust all available administrative remedies even where the relief sought, such as monetary damages, cannot be granted through the administrative process. Booth v. Churner, 532 U.S. 731 (2001). The "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002) (citation omitted).

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90-91 (2006). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's

8

requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones v. Bock, 549 U.S. 199, 218 (2007) (holding that exhaustion was not per se inadequate simply because an individual later sued was not named in the grievance, where prison policy did not require the prisoner to identify a particular responsible party). See also Spruill v. Gillis, 372 F.3d 213, 231 (3d Cir. 2004) ("prison grievance procedures supply the yardstick" for determining what steps are required for exhaustion").

Defendants have attached to their motion a copy of the New Jersey State Prison Inmate's Handbook, as revised October 2007, which was in effect at the time of the events complained of.  The Handbook provides, in pertinent part:

Inmate Responsibility for Using the INMATE REQUEST SYSTEM & REMEDY FORM

. . .

4.   It is very important that the information required in Part 1, "Inmates Request or Complaint area" be clear, complete, easy to read, understand and factually accurate regarding the stated problem or concern being presented.

. . .

Procedures for Preparing the INMATE REQUEST SYSTEM & REMEDY FORM

. . .

2.   Inmates are to supply all information necessary to complete the form.  It is important that the information [is] clear, complete and easy to read and understand as possible in order that the

9

problem being addressed be clearly understood.
The inmate's name, SBI number, institution,
housing unit and date of request/complaint <u>MUST</u>
appear on the form.  Failure to do so may render
the form unacceptable as submitted.  Be sure that
you press firmly on the form, so that all copies
are clearly readable.  Please use a pen if
possible.  When a form is submitted incorrectly it
may be returned to you with a cover form called
the Department of Corrections Inmate Request
System and Remedy System Corrective Action Form
(IRSF 103), which will indicate the actual reason
your form is being returned to you.

. . .

4.    Inmates are to be as specific as possible when
      completing the form.  Please note your concerns or
      problem in the space provided.  You may use
      additional pages if needed to complete your
      request or concern.  You may attach supporting
      documents if necessary.

. . .

<u>INMATE REQUEST SYSTEM AND REMEDY FORM APPEAL PROCESS</u>

1.    You may appeal a staff response to your Inmate
      Request System and Remedy Form.

2.    You must submit the appeal within ten (10) days of
      the date your response is returned to you;
      indicated in the shaded area, Part 2, where it
      reads "Date Response Returned to Inmate."  Appeals
      submitted outside of stated time frame will not be
      accepted or processed.

3.    Appeals must be submitted using the yellow copy
      (copy returned to you) of the **original** IRSF 101
      form you submitted.  Complete part 4 (part 1, 2
      and 3 will have already been processed.)  Use
      additional paper if more space is required.
      Appeals submitted in any other fashion will not be
      processed.

4.    The Administrator/Designee will render a decision
      regarding your appeal in part 5.

> 5.   The yellow copy of the Inmate Request System and
>      Remedy Form will be returned to you.  Moreover, an
>      appeal with a decision rendered <u>completes</u> the
>      process at the institutional level.

(Motion, Decl. of Christopher Holmes, Ex. B, Handbook at 95-98

(emphasis in original).)

Also in support of their Motion, Defendants have submitted

copies of almost 100 Inmate Remedy Forms submitted by Plaintiff

in 2008 and 2009, approximately half of which relate to medical

concerns.  (Holmes Decl., Ex. C.)  As argued by Defendants,

Plaintiff generally did not appeal the responses to his medical-

care Inmate Remedy Forms.  There is one exception, with respect

to Dr. Wu.

On October 31, 2008, and November 1, 2008, Plaintiff

submitted Inmate Remedy Forms complaining about his inadequate

pain medications.  In the October 31, 2008, Inmate Remedy Form,

Plaintiff complained that Dr. Wu had only prescribed one Naproxen

tablet every 12 or 14 hours.  Plaintiff ascribed this allegedly

inadequate prescription to racial discrimination.  In the

November 1, 2008, Inmate Remedy Form, Plaintiff asserts that he

received his prescribed Vicodin on October 31, 2008, and that the

nurse advised him then that his Vicodin prescription had been

renewed, but that the next day she told him there was no signed

renewal order for the Vicodin.  The second Inmate Remedy Form was

answered first, with information that Dr. Wu had ordered Naproxen

until November 24, 2008, and that Plaintiff was receiving his

Naproxen as prescribed.  Plaintiff appealed the responses to both
of these Inmate Remedy Forms.

On November 13, 2008, he prepared an Attachment to the
Appeal of the response to the November 1, 2008, Inmate Remedy
Form, which reads in pertinent part:

> The neurological injury I suffer has been clearly
> defined in MRI's and other clinical studies conducted
> on my brain, and it has been DIAGNOSED by a Virginia
> neurosurgeon and neurologist, as well as, G.P.s and
> neurologists in the following federal institutions: . .
> . . There is not a cure for my brain injury, though
> I've had excessive fluid drained out of my brain on 2
> occasions, the ONLY treatment for my injury is to
> afford me sufficient pain medication to allow me relief
> from the <u>CONSTANT</u> pain I suffer.  Dr. Johnny Wu is not
> a neurologist nor competent to treat or prescribe in my
> condition; indeed, he continually tells me that he must
> get APPROVAL from someone else to treat me.  These
> conditions submit to further harm in violation of the
> Eighth Amendment of the U.S. Constitution ... .

> I am not opid dependent nor seeking medication.  .
> . .

> . . .  Additionally, examination by the
> orthopedist on 11/13/08; revealed that I have suffered
> nerve damage to my left arm.  Dr. Allen B. Martin,
> prescribed (2) two 5 mg Hydrocodone tablets twice daily
> for my pain, until I could be examined by the
> neurologist and given treatment; I have not been
> examined by the neurologist, and my medication has been
> stopped.

> Dr. Johnny Wu who has never examined me, nor once
> drawn a "blood fat" test BEFORE I began treatment; uses
> improper procedures to deny me the food supplement I
> need.  Employee Wu tells me that he is going to monitor
> this in the future in total deliberate indifference to
> my health and well being.  ...

> On 11/13/08 I was examined by the orthopedist in
> relation to my left arm; accordingly, he recommended I
> be given stronger pain medication than the 1 Naproxy

[Naproxen] tablet I am being given for my left arm.
each 12 or 14 hours.  Although the pain in my arm is
severe; it is nothing compared to the neurological pain
I suffer, that is not being treated.  ...  I,
respectfully request, that you exercise the authority
of your office to observe the mandates of the
N.J.D.O.C. and protect me from harm; by taking the
following corrective action:

1.    ORDER, the medical department to reinstate the
      medications for my neurological condition that
      they improperly discontinued, and exam by
      neurologist

2.    ORDER, the medical department to provide me
      treatment of my SLEEP DISORDER as I am not able to
      sleep for 4-5 days at a time; then, I am only
      unconscious for 2 or 3 hours

3.    ORDER, the medical department to provide me a milk
      substitute (I can not drink milk) and Ensure -- I
      am more than 45 pounds under my normal weight

4.    ORDER, the medical treatment to provide me treatment
      recommended by the orthopedist.

(Holmes Decl., Ex. C, DOC 60-61 (emphasis in original).)

     In his Appeal to the response to his October 31, 2008,

Inmate Remedy Form, Plaintiff stated:

     I need my (2) Hydrocodone Tablets reordered; my Ensure
     reordered, and something ordered to help me sleep as I
     can not sleep for 3-5 days, then, its only for a couple
     hours.  Also, I need to see neurologist to be given
     proper medicament of my brain injury.  1 ULTRAM tab
     every 3 days - according to nurse Davis - is
     insufficient.  I can not take ULTRAM!.

(Holmes Decl., Ex. C, DOC 58.)

     The final response to Plaintiff's appeal read as follows,

in its entirety.

     In response to your forms received in November and
     December and after reviewing your medical records, it

has been noted that all of the medicines are current
and up to date.  Also the complaints pertaining to the
staff have been noted and there has been a meeting
regarding the previous actions on your behalf.

Please write again if this has not been resolved.

(Holmes Decl., Ex. C, DOC 62.)

Although the Inmate Request and Remedy Form System rules set
forth in the Inmate Handbook do not explicitly require the naming
of staff related to a Remedy request, the rules do require that
the information provided be "clear," "complete," and "specific."
Where the prisoner has named a specific staff member -- here, Dr.
Wu -- as the source of the problem, this Court finds that
Plaintiff has failed to exhaust his administrative remedies with
respect to other medical providers, here, Drs. Ahsan and
DeFilippo.  Accordingly, all Eighth Amendment claims against Drs.
Ahsan and DeFilippo will be dismissed with prejudice[3] for failure
to exhaust administrative remedies.  The claims against Dr. Wu,
however, were exhausted and will be addressed on their merits.

The Eighth Amendment to the United States Constitution,
applicable to the individual states through the Fourteenth
Amendment, prohibits the states from inflicting "cruel and
unusual punishments" on those convicted of crimes.  <u>Rhodes v.
Chapman</u>, 452 U.S. 337, 344-46 (1981).  This proscription against

---

[3] These claims are dismissed with prejudice because it does
not appear that Plaintiff could now return to the Inmate Request
and Remedy Form System to exhaust those claims which would, in
any event, now be time-barred.

cruel and unusual punishment requires that prison officials provide inmates with adequate medical care.  Estelle v. Gamble, 429 U.S. 97, 103-04 (1976).  In order to set forth a cognizable claim for a violation of his right to adequate medical care, an inmate must allege: (1) a serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need.  Id. at 106.

To satisfy the first prong of the Estelle inquiry, the inmate must demonstrate that his medical needs are serious. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"  Hudson v. McMillian, 503 U.S. 1, 9 (1992).  Serious medical needs include those that have been diagnosed by a physician as requiring treatment or that are so obvious that a lay person would recognize the necessity for doctor's attention, and those conditions which, if untreated, would result in lifelong handicap or permanent loss.  Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988).

The second element of the Estelle test requires an inmate to show that prison officials acted with deliberate indifference to his serious medical need.  "Deliberate indifference" is more than mere malpractice or negligence; it is a state of mind equivalent

15

to reckless disregard of a known risk of harm.  Farmer v.
Brennan, 511 U.S. 825, 837-38 (1994).  Furthermore, a prisoner's
subjective dissatisfaction with his medical care does not in
itself indicate deliberate indifference.  Andrews v. Camden
County, 95 F.Supp.2d 217, 228 (D.N.J. 2000); Peterson v. Davis,
551 F.Supp. 137, 145 (D. Md. 1982), aff'd, 729 F.2d 1453 (4th
Cir. 1984).  Similarly, "mere disagreements over medical judgment
do not state Eighth Amendment claims."  White v. Napoleon, 897
F.2d 103, 110 (3d Cir. 1990).  "Courts will disavow any attempt
to second-guess the propriety or adequacy of a particular course
of treatment . . . [which] remains a question of sound
professional judgment.  Implicit in this deference to prison
medical authorities is the assumption that such informed judgment
has, in fact, been made."  Inmates of Allegheny County Jail v.
Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation and
citation omitted).  Even if a doctor's judgment concerning the
proper course of a prisoner's treatment ultimately is shown to be
mistaken, at most what would be proved is medical malpractice and
not an Eighth Amendment violation.  Estelle, 429 U.S. at 105-06;
White, 897 F.2d at 110.

"Where prison authorities deny reasonable requests for
medical treatment, however, and such denial exposes the inmate
'to undue suffering or the threat of tangible residual injury,'
deliberate indifference is manifest.  Monmouth County Corr. Inst.

16

Inmates v. Lanzaro, 834 F.2d at 346 (citations omitted).  "Short
of absolute denial, 'if necessary medical treatment [i]s . . .
delayed for non-medical reasons, a case of deliberate
indifference has been made out."  Id. (citations omitted).
"Deliberate indifference is also evident where prison officials
erect arbitrary and burdensome procedures that 'result[] in
interminable delays and outright denials of medical care to
suffering inmates.'"  Id. at 347 (citation omitted).

     In support of their Motion for summary judgment, Defendants
have supplied the Court, under seal, with several hundred pages
of medical records, spanning December 2007 through the period of
this litigation.[4]  Those medical records reflect that, as of the
time of the events complained of, Plaintiff suffered from reduced
vision, COPD, asthma, otitis, a history of opioid dependence, as
well as other conditions not relevant here.  The medical records
further reflect that Plaintiff was allergic to Penicillin,
Bactrim, and Aspirin, but reflect no other difficulties with
medication.  In addition, the medical records reflect that
Plaintiff used a knee brace and a cane because of damage to his
knee.  With respect to Plaintiff's gastrointestinal complaints,
especially difficulty in swallowing, the records reflect that he

---

     [4] The medical records are attached to the Declaration of
Christopher Holmes (Docket Entry No. 49) and the pages are
individually numbered.  They will be referred to herein by their
page numbers, e.g., "MED 001."

17

was on a low fat/low sodium diet and that he was sent for an upper endoscopy.  As of April 2008, when Plaintiff was sent for his endoscopy, the records reflect that Plaintiff was 70 inches tall, weighed 160 pounds, and denied any recent weight loss.  The endoscopy revealed no explanation for Plaintiff's complaint of difficulty in swallowing.

Also in the spring of 2008, Plaintiff received treatment for pain in his left elbow and shoulder.  In the spring of 2008, Plaintiff was taking Hydrocodone-Acetaminophen, Proventil, and Methocarbamol, as oredered by Dr. Ahsan.  In May of 2008, it was noted that Plaintiff may have suffered a vascular migraine, and he received an MRI of his brain.  The MRI results indicated nonspecific white matter signal abnormalities.  Shortly thereafter, in June 2008, Plaintiff was seen by Dr. Ahsan for complaints of chronic pain in stiffness in his left shoulder and for chronic headache pain.  Dr. Ahsan reduced the Hydrocodone-Acetaminophen and prescribed Tylenol 325 mg tablets for 180 days.  The medical records reflect a medical decision to attempt to address chronic pain with non-narcotics, even though the inmate may have an inclination to seek "narcotics" for recreational purposes, as he made the claim that Vicodin was not helping.  The records also reflect that Plaintiff was walking with a slight limp, but that he had free shoulder movement.  Also in June 2008, Plaintiff reported involuntary weight loss in response to which

18

Dr. Ahsan prescribed the Ensure nutritional supplement, one can per day, for 90 days.  Dr. Ahsan also discontinued the Tylenol and increased the Hydrocodone-Acetaminophen, for 30 days, for Plaintiff's pain.  In 2008, Plaintiff was also seen for his breathing difficulties and was prescribed medication.  Plaintiff was seen by Dr. Ahsan and other medical professionals in 2008 multiple times for other problems and received treatment.  In addition, his pain medications were modified multiple times.

The medical records reflect that Dr. Wu first treated Plaintiff in October 2008 in response to Plaintiff's claim that he was having difficulty raising his left arm.  (MED 369.)  An x-ray revealed no fracture or dislocation.  Dr. Wu prescribed Naproxen for 30 days for the pain.  Also in October 2008, Plaintiff first advised the medical department that he was allergic to condensed milk and requested a dietary order.

Also in October 2008, Dr. Wu noted that Plaintiff did not demonstrate a medical need for a nutritional supplement, but that he would order weight and height measures.[5]  (MED 358.)  In December 2008, the medical records reflect that Plaintiff requested a prescription for Ultram.  (MED 357.)  The records reflect that in November 2008, in response to Plaintiff's request for a renewal of Vicodin, Dr. Wu advised Plaintiff that a review

---

[5] As of October 31, 2008, Plaintiff's height was listed as 68 inches, weight 145 pounds.  (MED 356.)

of his medical records did not show a clear indication for chronic opioid use; that his body mass index was satisfactory and did not meet the criteria for a nutritional supplement; and that the doctor would monitor Plaintiff's condition.  The records reflect that three days later Plaintiff refused his Naproxen and requested a renewal of his Vicodin prescription.  Two days later, Plaintiff took the Naproxen.  In November 2008, Dr. Wu prescribed the pain reliever Tramadol (Ultram).  The records reflect that in December 2008, Plaintiff refused both Naproxen and Tramadol, but gave no reason why.  On December 17, 2008, a nurse followed up with Plaintiff about his medications, noting that one of his medications (Tramadol) was to be given in conjunction with physical therapy, which had not yet been scheduled.  On December 26, 2008, Dr. Ahsan amended the Tramadol prescription to provide for daily use for 90 days, even without physical therapy.

Plaintiff continued to be seen on a regular basis, by various medical professionals, throughout 2009.  Dr. Wu ordered physical therapy to improve the problems with Plaintiff's left shoulder.  In February 2009, Plaintiff complained to his physical therapist, who expressed no opinion, that he was not satisfied with his knee brace.  In March, 2009, Plaintiff was prescribed the muscle relaxant Robaxin; Plaintiff's medical records reflect a note to monitor his Robaxin use to avoid abuse.

Plaintiff's records reflect that he was seen on March 26, 2009, by Dr. Arthur Brewer.

> Patient was seen today, because of dissatisfaction with medical treatment.  Chart was reviewed and case was discussed with Dr. Wu.  Patient is requesting medication for sleep and he is requesting ensure. Patient has been seen by mental health, and currently there is no medical indication for use of sleep medication.  Patient current BMI is 21 which is within normal limits, subsequently there is no medical need for ensure.  Patient was unhappy with the feedback and he terminated the encounter.

(MED 318.)

On March 27, 2009, in response to Plaintiff's complaints of shoulder pain associated with his physical therapy, Dr. Ahsan prescribed Acetaminophen-Codeine for 30 days for pain.  Four days later, Plaintiff again requested Ultram/Tramadol in addition to the Acetaminophen-Codeine, but Dr. Ahsan declined to add the second pain reliever and advised Plaintiff to discuss it with his doctor at his scheduled appointment in April, 2009.  (MED 313.) On April 9, 2009, Dr. Ahsan increased the Acetaminophen-Codeine prescription.  On April 24, 2009, Dr. Ahsan discontinued the Acetaminophen-Codeine.  (MED 295.)

The records reflect that Plaintiff fell out of bed and injured his hand on April 26, 2009, for which he received immediate, and ongoing, pain medication.  Plaintiff refused to go to the clinic to be evaluated.  (MED 292.)  An x-ray was ordered the next day, which revealed a fracture.  Plaintiff was scheduled for surgery on May 5, 2009, but he refused.

As of May 6, 2009, Plaintiff's weight was stable at 144 pounds.  On May 22, 2009, Dr. Ahsan prescribed Tylenol/Codeine for 30 days.  That prescription was renewed in June and July, 2009, prior to the filing of this Complaint.  The medical records provided reflect that, throughout the pendency of this litigation, Plaintiff continued to be seen by medical professionals at New Jersey State Prison who continued to monitor and provide appropriate  pain medication and other treatment for the physical ailments that are the subject of this litigation.[6]

With respect to the merits of Plaintiff's Eighth Amendment claims, the moving Defendants have established that there is no genuine dispute as to any material fact relating to the issue of "deliberate indifference," and that, therefore, they are entitled to summary judgment as a matter of law.  There is absolutely nothing in Plaintiff's medical records to suggest any deliberate indifference to Plaintiff's various medical problems.  To the contrary, Plaintiff's medical records reflect that Dr. Wu and other medical professionals at New Jersey State Prison met regularly with him to evaluate his various medical problems and

---

[6] In addition, although this Court has summarized in this Opinion the medical records with respect to the ailments that are the subject of the appealed Inmate Remedy request, the Court notes that the medical records reflect that Plaintiff was seen regularly with respect to other ailments, for which he received timely and appropriate medication and treatment, including mental health assessments and treatment for ailments such as the alleged sleep disturbances.

that they timely prescribed appropriate medications and other
treatment.  There is not any suggestion, even, of medical
negligence.  Instead, this is simply a case in which Plaintiff
disagrees with the treatment he has received.  Such a difference
of opinion does not establish an Eighth Amendment violation.
Thus, to the extent Plaintiff's claims are exhausted, the moving
Defendants are entitled to summary judgment on the merits of
Plaintiff's claims.

V.   <u>CONCLUSION</u>

For the reasons set forth above, the Motion (Docket Entry
No. 48) for summary judgment will be granted.  All pending
motions and applications will be denied as moot.   More
specifically, with respect to Plaintiff's appeal (Docket Entry
No. 62) of the Order of Magistrate Judge Douglas E. Arpert
(Docket Entry No. 60) denying Plaintiff's third request for an
extension of time to reply or move, this Court accepts and
affirms the Magistrate Judge's decision.  An appropriate order
follows.


 /s/ Joel A. Pisano
Joel A. Pisano
United States District Judge

Dated: March 14, 2012

23